UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

**MICHAEL KISSICK,**

      Plaintiff,

vs.                                     Case No.: 13-cv-99

**MICHAEL HUEBSCH, in his**
**official capacity as Secretary of the**
**Wisconsin Department of Administration,**
**and DAVID ERWIN, in his**
**official capacity as the Chief of the**
**Wisconsin Capitol Police,**

      Defendants.

BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

This case involves the chilling of core political speech in Wisconsin's Capitol Rotunda, a public space with unique symbolic significance.  This space – which is located in close proximity to those who exercise the legislative, executive and judicial power of state government – has been devoted historically to public debate of issues important to the people of the State.   In the wake of unprecedented demonstrations in the State Capitol in 2011, the Defendants in this case adopted a permit scheme limiting the use of the Capitol Rotunda.  Under this scheme, groups as small as four persons must obtain prior permission from the government before they may engage in expression "for the purpose of actively promoting any cause." Although the

government may regulate access to a public forum in a content-neutral manner narrowly tailored to achieve its interest in accommodating competing uses for a limited resource, the scheme adopted by the Defendants here operates as a content-discriminatory prior restraint on expressive activity and is overbroad in requiring small groups to obtain permission for expression, even when no other group is using the space.

Plaintiff Michael Kissick participated in demonstrations at the State Capitol Rotunda until September 2012, when Defendants began making arrests and issuing citations to individuals who participated in expressive activities without a permit. As a result of these arrests and citations, Mr. Kissick has refrained from exercising his First Amendment rights in the State Capitol since September 2012.  Mr. Kissick is suffering ongoing irreparable harm as a result of this clear infringement on his First Amendment rights, while the Defendants will suffer no harm by allowing Mr. Kissick and others to participate in peaceful protest activities in the Capitol Rotunda without a permit.  Mr. Kissick therefore asks this Court to issue a preliminary injunction forbidding the Defendants from enforcing the permit requirement and from punishing protesters who engage in expressive activity in the Rotunda without a permit.

## STATEMENT OF FACTS

The Wisconsin State Capitol Building's interior public spaces, including the Rotunda area, have long been deemed a public forum for expressive activity. *Plaintiff's Proposed Statement of Facts* (*PPSOF*), ¶ 4. In its application for designation on the

National Register of Historic Places, the State of Wisconsin described the Capitol

Rotunda thus:

> Whereas some statehouses are maintained apart from the urban fabric,
> the Wisconsin Capitol Rotunda functions, both literally and symbolically
> as a city center and is fully utilized *as a public space to which all have claim*.

*PPSOF*, ¶ 4 (emphasis added).  The ground floor of the central Rotunda area occupies

over 9000 square feet and can accommodate hundreds of persons. *PPSOF*, ¶ 5.

In February 2011, individuals and groups from all around the State of Wisconsin

came to Madison to engage in protests sparked by legislation related to collective

bargaining for public employees and by other issues of intense public interest. *PPSOF*, ¶

6. These protests, while unprecedented in size, were almost entirely peaceful. *PPSOF*, ¶

7. Plaintiff Michael Kissick, an Assistant Professor at the University of Wisconsin

(*PPSOF*, ¶ 1), participated in these protests in and around the Capitol Building from

time to time, when his work schedule permitted. *PPSOF*, ¶¶ 15, 36. For several weeks,

the Capitol Police, then under the direction of Chief Charles Tubbs, allowed protesters

to remain in the Capitol Building beyond normal business hours. *PPSOF*, ¶ 8.

At the end of February 2011, the Department of Administration (the "DOA") and

Capitol Police attempted to end after-hours protests and impose new restrictions on

protesters in the Capitol Building, including closing certain entrances, queuing visitors

in different lines depending upon their reason for visiting the Capitol and installing

metal detectors.  Wisconsin AFSCME filed a lawsuit resulting in a temporary

restraining order that kept the Capitol open to protesters during normal working hours

and when other public government matters were being conducted.  *PPSOF*, ¶ 9. In June

2012, the litigation was ultimately concluded with a stipulation and order that, among other provisions, prohibited queuing visitors by purpose of visit and required that all ground-floor entrances remain open and metal detectors be removed, but permitted the DOA to close the building when government business was not being conducted and remove those who refused to leave.  See *Wisconsin State Employee's Union v. State of Wisconsin*, 2011CV990 (Dane Co. Cir. Ct.).

Protests inside the Capitol Building during regular business hours continued. *PPSOF*, ¶ 9. These protests remained almost completely peaceful.  *PPSOF*, ¶ 10. Along with other activities, singing emerged as part of the protests.  Some of the singing protest activity became known as the "Solidarity Sing Along." *PPSOF*, ¶ 11. Although certain people gave impetus to the Solidarity Sing Along and made unique contributions along the way, the Sing Along developed in a largely spontaneous way, without formal leadership or structure, as a way for some of the people who had been protesting at the Capitol to continue singing to express their concerns about various policies adopted by the state government. *PPSOF*, ¶ 12. Although the Sing Along became a regular event, taking place in the Capitol Rotunda at noon on most weekdays, the individuals involved in the Sing Along changed from day-to-day. *PPSOF*, ¶ 13. Singers did not necessarily adhere to any particular views or share any particular goals. *PPSOF*, ¶ 15. Mr.  Kissick joined the Sing Along from time to time, when his schedule permitted. The Sing Along was peaceful and non-disruptive. *PPSOF*, ¶ 16. When other groups used the Rotunda space, the Sing Along deferred to them in order to avoid conflict. *PPSOF*, ¶ 17.

4

In November 2011, the DOA issued a State Facilities Access Policy that, among other things, established a requirement that those holding "events" in the Capitol Building obtain a permit using a novel process. *PPSOF*, ¶ 18. After objections by the public, the DOA issued a revised Access Policy in December 2011. The revised Access Policy continued to require permits for events to be held at the Capitol. *PPSOF*, ¶ 19.

The permit scheme contained in the Access Policy treats applicants for permits differently based on the content of their proposed expressive "events." *PPSOF*, ¶ 20. Under the Access Policy, "[a]ny performance, ceremony, presentation, meeting, or rally" in the Capitol must obtain a permit. *PPSOF*, ¶ 21. The Access Policy excludes from the permit requirement "tourist activities or families visiting the Capitol; constituents or members of the public visiting elected officials; or the passage of individuals" to legislative, executive or judicial chambers or offices. *PPSOF*, ¶ 22. A "rally" is defined as a "gathering of four or more people for the purpose of actively promoting any cause." *PPSOF*, ¶ 23. Thus, any event that "promotes a cause" must obtain a permit if four or more people gather for that purpose. In order to ascertain whether a gathering of people is a "rally" subject to the permit requirement, the Capitol Police must assess the content of the group's expressive activity to determine if it "promotes a cause." *PPSOF*, ¶ 24. The permit scheme also gives the Capitol Police discretion to charge those seeking a permit an "advance payment" for "law enforcement expenses" "as a condition for granting a permit." *PPSOF*, ¶ 25.

The Capitol Police undertook no efforts to enforce the permit requirements of the Access Policy at the Capitol from December 2011 until early September 2012. *PPSOF*, ¶

26. The Solidarity Sing Along and other protest events continued, the Sing Along
without a permit. *PPSOF*, ¶ 27. These events remained largely peaceful and orderly.
*PPSOF*, ¶ 28. Mr. Kissick continued to participate in these protest activities from time to
time. *PPSOF*, ¶ 36. The Sing Along continued to defer to other activities taking place in
the Rotunda when the potential for conflict arose. *PPSOF*, ¶ 29.

In August 2012, shortly after his appointment as Chief of the Capitol Police,
Defendant David Erwin stated in the media that he intended to begin enforcing a
permit requirement. *PPSOF*, ¶ 30. In early September 2012, Capitol Police began
arresting protestors in the Capitol and issuing citations for alleged violations of various
provisions of Wis. Adm. Code Ch. Adm. 2, which governs use of state buildings and
facilities. *PPSOF*, ¶ 31. The Capitol Police continue to make arrests and issue citations to
protesters, including some of those participating in the Sing Along. *PPSOF*, ¶ 32. Some
protestors have been arrested at or near the Capitol and taken to the Dane County Jail
for booking. *PPSOF*, ¶ 34. Some of the citations issued by the Capitol Police have
alleged violation of Wis. Adm. Code § Adm. 2.14(v) for engaging in a rally without a
permit, without any other allegedly unlawful conduct.  *PPSOF*, ¶ 35.

Prior to September 13, 2012, when he was off work or on his way to or from
work, Mr. Kissick periodically went to the Capitol, where he carried signs and
sometimes participated in the Solidarity Sing Along. *PPSOF*, ¶ 36. Up until that date, he
had received no tickets, arrests or warnings from Capitol Police for engaging in these
activities. *PPSOF*, ¶ 37. On Thursday, September 13, 2012, Mr. Kissick went to the
Capitol Rotunda intending to join in the Sing Along. However, Capitol Police were

6

issuing tickets to a variety of protesters when he arrived. *PPSOF*, ¶ 38. Because there

was no discernible pattern as to whom the officers chose to ticket, Mr. Kissick asked

multiple officers what he could do and still be safe from being arrested or getting a

ticket.  *PPSOF*, ¶ 39. The officers refused to answer Mr. Kissick's questions.  Ultimately,

one officer indicated, in substance, that anyone "with this group" of protesters may be

ticketed, and that it would be "hard to argue" that Mr. Kissick was not part of the

group. *PPSOF*, ¶ 40. Since that time, Mr. Kissick has declined to participate in protest

activity in the Capitol building for fear of being ticketed or arrested, but would resume

his protests if he were assured he would not be arrested or cited. *PPSOF*, ¶ 41-43.

## ARGUMENT

To obtain a preliminary injunction, a party must show that it (1) has no adequate

remedy at law and will suffer irreparable harm if a preliminary injunction is denied, (2)

it has some likelihood of success on the merits, (3) the balance of equities favors the

moving party over the nonmoving party, and (4) an injunction is in the public interest.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Ezell v. City of Chicago*, 651

F.3d 684, 694 (7th Cir. 2011); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 769

(7th Cir. 2011).  "These considerations are interdependent: the greater the likelihood of

success on the merits, the less net harm the injunction must prevent in order for

preliminary relief to be warranted."  *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010).

"In each case, courts 'must balance the competing claims of injury and must consider

the effect on each party of the granting or withholding of the requested relief.'"  *Winter*,

555 U.S. at 24 (internal citations omitted).

I.     **KISSICK HAS NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM.**

"A loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries.").

II.    **MR. KISSICK IS LIKELY TO SUCCEED ON THE MERITS THAT THE PERMIT SCHEME OR ITS ENFORCEMENT VIOLATES THE FIRST AMENDMENT.**

A finding of likelihood of success requires only that the plaintiff present a "plausible claim on the merits." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).  The likelihood of success prong is more easily satisfied in First Amendment cases, where the *government* carries the burden of proving its regulations satisfy constitutional requirements.  *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 818 ("When First Amendment compliance is the point to be proved, the risk of nonpersuasion – operative in all trials – must rest with the Government, not with the citizen.") (citations omitted).

A.     **Defendants' Permit Scheme Is an Impermissible Content-Based Prior Restraint on Speech in a Public Forum that Does Not Satisfy Strict Scrutiny.**

Mr. Kissick seeks to engage in core political speech and association in the Capitol Building.  Political speech receives the highest degree of First Amendment protection.

8

Even potentially disruptive political speech stands upon the "highest rung of the
hierarchy of First Amendment values." *See NAACP v. Claiborne Hardware Co.*, 458 U.S.
886, 913 (1982); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995)
(political expression "occupies the core of the protection afforded by the First
Amendment").

The scope of the government's authority to regulate the speech of private
individuals and groups depends on the nature of the "forum" in which the speech takes
place.  The Supreme Court's First Amendment "public forum" cases have "identified
three types of fora: the traditional public forum, the public forum created by
government designation, and the nonpublic forum." *Arkansas Educ. Television Comm'n
v. Forbes*, 523 U.S. 666, 677 (1998) (*quoting Cornelius v. NAACP LDEF*, 473 U.S. 788, 802
(1985)). "Traditional public fora are defined by the objective characteristics of the
property, such as whether, 'by long tradition or government fiat,' the property has been
'devoted to assembly and debate.'" *Id.*  Traditional public fora include those public
spaces "like streets, sidewalks, and parks, which by custom have long been open for
public assembly and discourse." *Denver Area Educational Telecommunications Consortium
v. FCC,* 518 U.S. 727, 791 (1996).  A designated public forum, in contrast, is created when
the government makes "an affirmative choice to open up its property for use as a public
forum . . . 'by intentionally opening a non-traditional forum for public discourse.'"
*United States v. American Library Ass'n*, 539 U.S. 194, 206 (2003) (*quoting Cornelius*, 473
U.S. at 802).

As a general matter, an individual's right to freedom of expression is at its most robust and government's power to restrict private speech is at its lowest ebb when the speech takes place in a traditional public forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). However, even in a designated public forum, once the government opens the property to expressive activity, its ability to regulate speech is severely limited. When the government creates and maintains a designated public forum, "it is bound by the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 46.

The Capitol Rotunda is a public forum. This Court has previously determined that "the state of Wisconsin has opened the capitol rotunda to a variety of displays and exhibits and must be considered a public forum for the purpose of First Amendment analysis." *Gaylor v. Thompson*, 939 F. Supp. 1363, 1370 (W.D. Wis. 1996). The State's description of the Rotunda as "a city center . . . fully utilized as a public space to which all have claim" in its application to have the Capitol placed on the National Register of Historic Places confirms this legal conclusion. Wisconsin State Capitol, National Park Service Registration Form, National Register of Historic Places at 11.

In a traditional or designated public forum, the government may not restrict expression based on its content unless the regulation satisfies "strict scrutiny;" that is the restriction must be narrowly tailored to achieve a compelling government interest. *Perry*, 460 U.S. at 45-46. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. . . . Once a forum is opened up to assembly or speaking by some groups,

10

government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972); *see also Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 537 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.").

When a regulation requires a permit before a person may engage in speech, it may also be characterized as a "prior restraint." *Near v. Minnesota*, 283 U.S. 697, 713 (1931). Such prior restraints are, like other content-based restrictions in public fora, subject to searching judicial review. While prior restraints are not per se unconstitutional, "any system of prior restraint … bear[s] a heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (citing *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975)). *See also Cantwell v. Connecticut*, 310 U.S. 296, 306-307 (1940); *Cox v. New Hampshire*, 312 U.S. 569, 574-575 (1941); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-151 (1969).

The disfavor with which courts treat prior restraints arises not only from concerns about content-based censorship, but from the speech-inhibiting effects that permit requirements inevitably produce. "Both the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers." *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994); *see also Shuttlesworth*, 394 U.S. at 162 (Harlan, J., concurring)

11

("unduly cumbersome and time-consuming procedures" to obtain permit may deter some from exercising rights).  Being required to apply for a permit also "infringes on individuals' ability to engage in anonymous speech.  A speaker's 'decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment.'" *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 523 (D.C. Cir. 2010) (quoting *McIntyre*, 514 U.S. at 342).  Because "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance," the state in certain circumstances "may not compel members of groups engaged in the dissemination of ideas to be publicly identified."*Talley v. California,* 362 U.S. 60, 64-65 (1960); *see also McIntyre*, 514 U.S. at 342-43.  This is particularly true for small and politically disfavored groups.

Ministerial permit requirements with content-neutral standards that constrain the discretion[1] of the administering government official are generally subject to the requirements for content neutral "time, place and manner" regulations of speech, discussed in the next section of this brief.  *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322-323 (2002).  However, a content-based permit requirement is subject to a strict scrutiny standard of substantive justification, as well as the procedural requirements for prior restraints set out in *Freedman v. Maryland*, 380 U.S. 51 (1965).  Under *Freedman*, any

---

[1] In one situation, the Administrative Code purports to vest the Defendants with unbridled discretion in deciding whether to grant a permit.  Section Adm. 2.04(2) provides that "[i]n the event of a conflict of requests by two or more organizations, the department shall have *full discretion* when permitting use of state office buildings and facilities." (emphasis added).  The Access Policy, however, appears to adopt a content-neutral "first-come, first-served" mechanism for resolving conflicting applications.  Access Policy at 13 ("Permits shall be processed in the order received.").  The ambiguity created by this contradiction between the Code and the Policy adds to the impermissible vagueness of the permit scheme.

content-based restraint on speech prior to judicial review must last only for a specified brief time period; expeditious judicial review must be available; and the government must bear the burden of going to court to enjoin the speech and of proving that suppression of speech is substantively justified.  380 U.S. at 58-60; *FW/PBS,* 493 U.S. at 227.

A content-based restriction is one that requires a government official to consider the "subject matter" of the speech to determine whether and how it applies.[2]  Where "the content of the speech . . . determines whether it is within or without the [regulation]," and thus "singles out certain viewpoints or subject matter for differential treatment," the regulation is content-based.  *Schultz v. City of Cumberland*, 228 F.3d 831, 840 (7th Cir. 2000) (*quoting Carey v. Brown*, 447 U.S. 455, 462 (1980)) (internal quotations omitted); *see also Deida v. City of Milwaukee*, 176 F.Supp.2d 859, 865 (E.D. Wis. 2001) ("If it is necessary to look at the content of the speech in question to determine whether the speaker violated the regulation, then the regulation is content-based.").

---

[2] The Access Policy at various points disavows "content-based discrimination" (*see, e.g.*, Access Policy at 5) and states that permits "may not be denied on the basis of the content of the speech, the event or the exhibit."  Access Policy at 13.  However, these disclaimers are belied by the operative terms of the Policy.  As explained below, the Policy requires consideration of content in determining whether a gathering of persons is an "event" subject to any permit requirement, and then whether the "event" is a "rally," which requires a permit for four or more persons, or some other type of event, which requires a permit for a different-sized group.  Similarly, charging for the deployment of additional police officers (Access Policy at 6) inherently requires an assessment of speech content to determine the number of officers needed.  Although imposition of a cost for a permit is not a "denial" of a permit, imposition of different costs for different speakers or subject matter is still impermissible "content-based discrimination." "[C]ontent-based burdens must satisfy the same rigorous scrutiny as . . . content-based bans. Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell v. IMS Health, Inc.*, 131 S.Ct. 2653, 2664 (2011) (internal quotations and citations omitted).

Defendants' permit scheme regulates expressive activity in a manner that is not content-neutral, because the Access Policy distinguishes between "rallies" and other types of groups of people or "events" in determining whether a permit is required. The Capitol Police must look at the content of a group's speech to determine if the group is "actively promoting a cause" in order to determine whether the permit rules for a "rally" apply or whether the group or gathering falls into an exception or a different category of "event." For example, in order to determine whether a group of four or more people talking in the Capitol Rotunda is engaged in a "tourist activity" and thus would not need a permit, or a "rally" and thus would need a permit, the Police must determine whether the content of their verbalization "promot[es] a cause." Similarly, depending on the content of the songs being sung – that is, whether the songs "promote a cause" – a group of three people singing may be classified as a "performance," which would need a permit, or as a "rally," which would not.

In addition, the permit scheme allows the Defendants to charge those seeking a permit an "advance payment" for "law enforcement expenses" "as a condition for granting a permit." Access Policy at 6. Ordinarily, a fee for a permit that varies according to perceived law-enforcement needs is impermissible, because such a variable fee necessarily requires the government official to consider the content of the speech to determine the size of the police presence necessary. In *Forsyth County v Nationalist Movement*, 505 U.S. 123 (1992), the Supreme Court held that an ordinance that permitted a government official to "assess a fee to cover 'the cost of necessary and reasonable protection of persons participating in or observing said . . . activit[y]'" was

14

based on the content of the speech because, "in order to assess accurately the cost of security . . . the administrator must necessarily examine the content of the message conveyed . . . ." *Id.* at 134 (internal citations omitted).[3] So here, in order to accurately determine the law enforcement needs for a rally, the Defendants must look at the content of the applicant's speech – the "cause" the rally will be "promoting," in the language of the Access Policy – to determine how popular or interesting the "cause" is likely to be, and thus estimate how many supporters or onlookers may be present.  In setting the cost, there is also a risk the police may consider the identity of the applicants, and whether they believe such speakers are more likely to cause trouble.  Treating speakers differently based on their identity is equivalent to content-based discrimination.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, __, 130 S.Ct. 876, 899 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content."); *cf. Sorrell*, 131 S.Ct. at 2663 (treating "content- and speaker-based restrictions" as equivalent).

Because the permit scheme is content based, it is invalid unless it is narrowly tailored to achieve a compelling governmental purpose. The purported purposes of the Defendants' permit scheme are "to coordinate multiple uses of public buildings,

---

[3] Although the Defendants here have crafted the Access Policy so that permit applicants are not charged for the cost of policing a *counter-rally*, and thus avoid the particular "heckler's veto" problem in *Forsyth County*, the Seventh Circuit has held that *Forsyth County* "applies to any ordinance that allows determination of an event permit fee grounded on content, even if pegged to anticipated administrative expense or the cost of maintaining public order. Justice Blackmun did not limit the scope of the Court's decision to the heckler's veto scenario.  Instead, he stated broadly that the Court was addressing whether the right to free speech was violated by an assembly ordinance that allowed a government official power to vary the fee according to the estimated cost of maintaining public order." *Surita v. Hyde*, 665 F.3d 860, 876-77 (7th Cir. 2011).

preserve public safety and welfare of the public, preserve the aesthetic appearance of historic buildings, and to protect the public from financial losses."  Access Policy at 3. Although preservation of public safety may be a compelling governmental purpose, the permit requirements here are not sufficiently narrowly tailored because there are less restrictive ways to achieve the government's safety objectives. "If a less restrictive alternative would serve the Government's purpose, the [government] must use that alternative." *Playboy Entertainment Group*, 529 U.S. at 813.

It should be noted that the protests throughout 2011, including the ongoing Sing Along (which did not have a permit), have been almost entirely peaceful.  Although there have been isolated cases of disorderly conduct at the Capitol, protestors have not engaged in physical violence against others in the Capitol and even damage to the Capitol building has been minimal.  The Capitol Police got along without enforcing the permit scheme in its Access Policy for over 9 months after its adoption, which demonstrates that it is unnecessary to preserve public order.

Moreover, the Defendants have existing means to deal with protesters who engage in unlawful actions that affect public safety in the Capitol.  Chapter Adm. 2 of the Administrative Code provides for a forfeiture for, inter alia, possession and consumption of alcohol (Adm. 2.14(2)(a) & (b)), smoking (Adm. 2.14(2)(c)), making excessive noise (Adm. 2.14(2)(e) & (f)), aggressive panhandling (Adm. 2.14(2)(i)), violent or disorderly conduct (Adm. 2.14(2)(k)), prostitution (Adm. 2.14(2)(n)), possessing or using illegal drugs (Adm. 2.14(2)(r) & (s)), starting fires or causing other damage to property (Adm. 2.14(2)(t) & (u)), and engaging in activities that hinder ingress and

16

egress or normal use of the building (Adm. 2.14(2)(v)1, 2, 4 & 9). In addition to these Code provisions, the Capitol Police may enforce applicable Madison Ordinances and criminal statutes prohibiting dangerous conduct.  Indeed, the Defendants have effectively used these means to prosecute and deter behavior that threatens public safety, and their existence demonstrates that the regulation at issue here is not necessary.  *See Texas v. Johnson*, 491 U.S. 397, 410 (1989) ("Texas already has a statute specifically prohibiting breaches of the peace . . ., which tends to confirm that Texas need not punish this flag desecration to keep the peace.").

The Defendants also could have achieved their goals by using a voluntary permit or reservation system.  A group seeking to use the space for an event could choose to apply for a permit that would reserve the space at the specified time.  A group choosing to not apply for a permit would be allowed to use the space, unless a different group had reserved it by obtaining a permit for the space at the same time.  In the case of such a conflict, the permit-holder trumps the unpermitted group. This is essentially how the Capitol Police dealt with expressive events until September 2012, when Defendant Erwin began the current crack-down.

As discussed more fully below, the Defendants could also have adopted a scheme that applied only to larger groups likely to genuinely affect public safety.

Finally, the Access Policy does not contain the procedural safeguards required for content-based prior restraints of speech.  Although the Access Policy indicates the Capitol Police will process applications "as expeditiously as possible" and that decisions will "[g]enerally" be made within ten business days, the only absolute time

17

limit for decision specified in the policy is 30 days.  Access Policy at 13.  Upon receiving

a rejection, the applicant must appeal to the Chief, who has three days to affirm or

overrule the denial.  *Id.* at 13.  If the Chief affirms a denial of a permit, the applicant may

then seek judicial review in circuit court under Wis. Stat. Ch. 227.  Wis. Stat. § 227.55

provides that the agency must transmit the record of the hearing to the circuit court

within 30 days of the service of the petition for review.  In the meantime, the Chief's

denial presumptively remains in effect.  Wis. Stat. § 227.54.  Once the circuit court

finally reaches the merits, the review is generally deferential to the agency.  Wis. Stat. §

227.57; *see Kitten v. Dep't of Workforce Devel.*, 2002 WI 54, ¶ 5, 252 Wis.2d 561, 644 N.W.2d

649 (factual findings of agency to be upheld if "reasonable," even if not supported by

preponderance of evidence); *DaimlerChrysler v. LIRC*, 2007 WI 15, ¶¶ 15-17, ¶ 22, 299

Wis.2d 1, 727 N.W.2d 311 (describing "controlling weight" deference to agency's

interpretation of its rules and regulations and "great weight" deference to agency's

interpretation and application of statutes).

Thus, under the Access Policy and Ch. 227, an applicant may need to wait up to

63 days from the date of application before the circuit court even has a record upon

which to act.  During this time, he or she is unable to engage in the desired expressive

activity.  This is not a sufficiently "brief" period of time during which the applicant's

speech is suppressed prior to judicial review.  *See Church of the American Knights of the*

*Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003) (long period of advance

notice for rally permit unreasonable); *Sullivan v. City of Augusta*, 511 F.3d 16, 38-39 (1st

Cir. 2007) (striking down 30-day notice requirement for parade permit under content

neutral scheme).  Moreover, the requirement that the "person aggrieved" – the denied applicant – must initiate judicial review (Wis. Stat. § 227.53(1)) and the deferential level of the court's review violate the principle that the government must bear the burden of invoking the court procedure and of proving that its denial of a permit is lawful.

### B.  Defendants' Permit Scheme Is an Unconstitutionally Overbroad Regulation of Speech.

Even if the permit scheme could properly be characterized as a content-neutral time, place and manner regulation, its requirement that a group as small as four obtain a permit before engaging in expressive activity in the Rotunda and the Defendants' enforcement of the permit requirement in cases where no other group is using the space do not satisfy the intermediate scrutiny applicable to such regulations.

"[A]ny permit scheme controlling the time, place and manner of speech must not be based on the content of the speech, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Forsyth County*, 505 U.S. at 130.  A time, place and manner regulation is "narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  "Although a content-neutral restriction will not be struck down 'simply because there is some imaginable alternative that might be less burdensome on speech,' the existence of 'numerous and obvious less-burdensome alternatives . . . is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable.'" *Boardley*, 615 F.3d at 519 (internal citations omitted) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 797 (1989)

19

& *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993)). A court must "closely scrutinize the regulation to determine if it indeed promotes the Government's purposes in more than a speculative way." *Community for Creative Nonviolence v. Kerrigan*, 865 F.2d 382, 390 (D.C. Cir. 1989).

### 1. Permit Requirements That Apply to Small Groups Are Impermissibly Overbroad.

A number of cases have considered whether permit requirements that apply to very small rallies satisfy this level of scrutiny. The courts have recognized that public safety and managing competing demands for a forum are "significant" government interests, but have rejected permit requirements applied to small groups as being insufficiently narrowly tailored. In *Cox v. City of Charleston*, 416 F.3d 281, 285 (4th Cir. 2005), for example, the court held that "the unflinching application of the [assembly permit ordinance] to groups as small as two or three renders it constitutionally infirm." The court reasoned that "the City has not established why burdening" peaceful, non-obstructive gatherings "is necessary to facilitate its interest in keeping" its public spaces "safe, orderly and accessible." *Id.* at 286. Similarly, the Sixth Circuit has held that "[p]ermit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *Arab-American Anti Discrim. Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005).

In *Burk v. Augusta-Richmond County*, 365 F.3d 1247 (11th Cir 2004), the court rejected a county ordinance requiring permits for groups as small as five. The court reasoned that the "substantial interest the County has in protecting public safety and

ensuring the free flow of traffic are simply not advanced by the breadth of this permit requirement, which applies to every group of five people standing in a park, sidewalk or countless other public places, who wish to support a political candidate, a local ordinance, or perhaps even a soldier coming home from war. 'It is offensive – not only to the values protected by the First Amendment, but to the very notion of a free society – that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so.'" *Id.* at 1259-60 (*quoting Watchtower Bible & Tract Soc. of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165-66 (2002). In *Grossman*, the court similarly rejected the application of a permit requirement to a group of 6-8 people.  33 F.3d at 1201-02, 1207; *see also Douglas v. Brownall*, 88 F.3d 1511 (8th Cir. 1996) (expressing doubt that "application of permit requirement to groups of ten or more . . . . is sufficiently tied to the City's interest in protecting the safety and convenience of its citizens"); *Knowles v. Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("[O]rdinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest."); *Boardley* 615 F.3d at 520-21 (same). In *Marcavage v. City of Chicago*, 659 F.3d 626 (7th Cir. 2011), the Seventh Circuit, in remanding for determination of the justification for applying a permit requirement to small groups "in light of the concerns that are unique to the venue," the Court noted the "powerful consensus" in the circuits that have "looked unfavorably on permit requirements for groups as small as the plaintiffs' group of five." *Id.* at 634-35.

Moreover, the "obvious less-burdensome alternatives" described in the previous section (*i.e.*, a voluntary "reservation" system and/or enforcement of other safety regulations) also demonstrate that the government's legitimate interests in safety and managing competing demands for the space may be achieved in a less burdensome manner.

### 2. Enforcing the Permit Requirement When There Is No Disturbance and No Competition for the Space Is Not Narrowly Tailored.

Arresting and/or citing members of the Sing Along under Wis. Adm. Code § Adm. 2.14(v) for failing to have a permit, when they are not jeopardizing public safety and when no other group is seeking to use the Capitol Rotunda at the same time, does not satisfy the narrow-tailoring requirement required for content-neutral time, place and manner restrictions.

The government has legitimate interests in protecting public safety and accommodating competing demands for the interior spaces of the Capitol.  However, in order to achieve those purposes, there are less-burdensome alternatives to arresting and/or citing peaceful participants in the Sing Along for failure to obtain a permit.  As noted above, the existence of "obvious less-burdensome alternatives" is a "relevant consideration in determining whether the 'fit' between ends and means is reasonable'" in applying the test for content-neutral time, place and manner restrictions. *Boardley*, 615 F.3d at 519 (internal citations omitted).

Participants in the Sing Along have been entirely peaceful.  Prosecuting them for failure to obtain a permit when they pose no threat to public safety is not narrowly

22

tailored to achieve the Defendants' public safety interests.  The Defendants have existing means to deal with individual protesters who engage in unlawful actions that affect public safety, such as arresting and prosecuting them under other provisions of the Administrative Code, state criminal statutes or municipal ordinances.  Moreover, if a group of protesters were to collectively present a danger to public safety, Wis. Adm. Code § Adm. 2.14(v) allows the Capitol Police to declare an "unlawful assembly," order participants to disperse, and prosecute those who fail to obey the order. Where such alternative means of keeping the peace exist, punishment for mere failure to have a permit is unnecessary. *See Texas v. Johnson*, 491 U.S. at 410 (availability of statute prohibiting disorderly conduct "tends to confirm" that government "need not punish" peaceful expressive activity "to keep the peace").

Similarly, when no other group is using the Capitol Rotunda, it is unnecessary to achieving Defendants' legitimate interest in coordinating multiple demands on the space for them to arrest, cite or prosecute members of the Sing Along for failure to obtain a permit.  If competing demands arise, a group with a permit trumps a group without a permit.  If neither group has a permit, the Capitol Police can apply a content-neutral "first-come, first-served" mechanism to resolve any dispute.  This is, in effect, how the Capitol Police operated for years, including the first nine months after the adoption of the current scheme.  In any event, the Sing Along has always simply deferred when another group has sought to use the Rotunda.  Prosecuting participants in the Sing Along is thus unnecessary to coordinate multiple uses.

C.      **Defendants' State Facilities Access Policy Is Unconstitutionally Vague.**

23

Under the Due Process Clause, a regulation is void for vagueness if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harris*, 347 U.S. 612, 617 (1954). Principles of due process demand greater specificity when the regulation may prohibit otherwise constitutionally protected conduct. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982); *see also Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). Vague statutes are impermissible because they punish behavior that a person could not be expected to know was prohibited, because they invite arbitrary and discriminatory enforcement, and because they threaten to chill other Constitutional freedoms. *See Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). In *Coates*, the Supreme Court struck down as facially invalid under the First and Fourteenth Amendments a municipal ordinance that made it illegal for three or more people to "conduct themselves in a manner annoying to persons passing by . . . ." *Id.* at 611-12. The Court concluded that the ordinance was "unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct." *Id.* at 614.

The Access Policy's prohibition of a "rally" without a permit is impermissibly vague, because it is impossible for a person of reasonable intelligence to determine whether any particular group of persons who may independently arrive at the Capitol constitute a "gathering for the purpose of actively promoting a cause." This is particularly true of the Sing Along, which could also be considered a "performance" under the Policy, and thus would need a permit for even one or two singers in the Capitol. If a topical song is sung, does the Sing Along then become a "rally," which requires a permit for four or more persons gathered together?

The concept of "promoting a cause" is also vague. Does promoting "a cause" require political motives or a political objective? Does it include religious utterances? Would it include expressions of cultural preferences? For example, does a trio that sings only Renaissance songs promote the "cause" of early music?

Moreover, the notion of being a "gathering" is ambiguous, as the largely spontaneous and leaderless Sing Along illustrates. Although it occurs regularly, it could be described as standing "jam session" that performs musical numbers, some but not all of which would be considered "topical," rather than as an organized or coherent group of people necessarily committed to the same "cause." The singers come to the Sing Along for their own reasons and may not share political or other goals. Indeed, many participants refuse to consider the Sing Along an organized entity at all, because such definition is incompatible with the spontaneity that characterizes the Sing Along.

The Defendants' insistence that the "organizers" of the Sing Along obtain a permit for all of the participants threatens these participants' associational freedoms.

25

Because the right to association necessarily entails the right to choose *not* to associate, *cf. Boy Scouts of America v. Dale*, 530 U.S. 640, 648-49 (2000) (right to expressive association entails right *not* to associate with those who wish to convey a different message), the participants in the Sing Along have a First Amendment right to not be associated with anyone who purports to be an "organizer" of the Sing Along.

## III.   DEFENDANTS WILL SUFFER NO IRREPARABLE HARM BY ALLOWING PEACEFUL PROTEST ACTIVITY IN CAPITOL ROTUNDA WITHOUT PERMITS.

The Defendants and their predecessors functioned for years without demanding that protesters obtain permits to use the Capitol Rotunda.  Even after the massive protests of early 2011, the Capitol Police were able to maintain order and protect First Amendment rights without permits. And the permit scheme that is now being enforced aggressively by Defendants was not enforced for nine months after its adoption.  This experience belies any suggestion that the Defendants will suffer any significant harm if their implementation of the permit scheme is delayed during the pendency of this litigation.

## IV.   THE PUBLIC INTEREST IS SERVED BY RESPECTING PROTESTERS' CONSTITUTIONAL RIGHTS.

The Court must weigh the effect on the public of a suspension of the permit scheme pending the outcome of the litigation.  The public's interest is in respect for the First Amendment:   "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Society*, 453 F.3d at 859.

### CONCLUSION

26

For the reasons set forth above, Plaintiff respectfully requests that this Court issue a preliminary injunction ordering Defendants to cease enforcement of their permit scheme.

Dated this 11th day of February, 2013.

<div style="margin-left:40%">

/s Laurence J. Dupuis
Laurence J. Dupuis
State Bar No. 1029261
ACLU of Wisconsin Foundation
207 East Buffalo Street
Suite 325
Milwaukee, WI 53202-5712
Telephone: (414) 272-4032
Facsimile: (414) 272-0182
Email: ldupuis@aclu-wi.org

A. Steven Porter
State Bar No: 1000195
Law Office of Steven Porter
7818 Big Sky Dr, # 112
Madison, WI 53719
Telephone: (608) 662-2285
Facsimile: (608) 662-9977
Email: asp@mailbag.com

Attorneys for Plaintiff Michael Kissick

</div>