IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL KISSICK,

                        Plaintiff,                          OPINION AND ORDER

        v.                                                  13-cv-099-wmc

MICHAEL HUEBSCH, in his official capacity as
Secretary of the Wisconsin Department of
Administration, and DAVID ERWIN, in his official
Capacity as the Chief of the Wisconsin Capitol
Police,

                        Defendants.

        This motion for preliminary injunction concerns a public forum that has been at

the center of public discourse in the State of Wisconsin since its completion in 1917:  the

massive Capitol rotunda.  As explained in its official nomination for designation as a

National Historic Landmark, which was granted on January 3, 2001:

> The soaring rotunda of the Wisconsin State Capitol is designed to induce
> its citizenry to be, as individuals, among the "resources of Wisconsin."
> Whereas some statehouses are maintained apart from the urban fabric, the
> Wisconsin Capitol Rotunda functions, both literally and symbolically, as a
> city center and is fully utilized as a public space to which all have claim.[1]

Despite this, a permit is now required if even a single person holds any "event" in the

rotunda of the State Capitol under recently amended rules and interpretive guidance

published by the Wisconsin Department of Administration.  Although not universally

enforced, the permit requirement has teeth -- a person who participates in an

---

[1] National Historic Landmark Nomination (dkt. #59-5 at 4); *see* complete nomination
("*Nomination*")  at  http://www.cr.nps.gov/nhl/designations/samples/wi/wisconsn.pdf  (last
visited July 3, 2013).

unpermitted event is subject to citation, forfeiture up to $500 if convicted, and more subtle repercussions that some fear from a record of political activism.

Plaintiff Michael Kissick, who would like to participate occasionally in an informal event known as the "Solidarity Sing Along" that meets inside the Capitol, alleges that this permitting scheme poses a dilemma for him personally. Sing Along participants have resisted characterization as an "organized group" or "organization," claim to gather over the lunch hour on an impromptu, if regular, basis and, therefore, have declined to designate anyone to obtain a permit. As a result, Kissick feels vulnerable to being cited, convicted and fined, as well as criticized as a public employee, should he join the Sing Along on any given day be and deemed by the Capitol police to be violating the permit requirement.

In this suit, Kissick claims that as applied to the State Capitol rotunda, the permitting requirement impinges his First and Fourteenth Amendment rights under the United States Constitution.[2] The subject of this opinion and order is his request for a preliminary injunction barring defendants Michael Huebsch, Secretary of the Wisconsin Department of Administration, and David Erwin, Chief of the Capitol Police, from enforcing the permitting requirement. Although the court finds little merit in some of Kissick's more sweeping constitutional arguments, he has demonstrated a strong likelihood of success on the merits of his claim that the permitting regulations impinge on his free speech rights and that the balance of relevant factors point in favor of a

---

[2] Kissick's claims may go further to include the "working" wings of the Capitol, but such claims are substantially weaker and not viable in the court's view as a basis for granting a preliminary injunction.

preliminary injunction of its enforcement for smaller groups in the Capitol's rotunda. Rather than impose a blanket prohibition on enforcing the existing permitting scheme, however, the court will preliminarily enjoin defendants from (1) distinguishing based on the content of the speech between "rallies" and other events for permitting purposes inside the Capitol and (2) enforcing the permit requirement for gatherings expected to draw 20 or fewer persons inside the Capitol rotunda itself.   Of course, nothing in this decision prohibits enforcement of existing laws and regulations that restrict disruptive noise or other disorderly conduct.


UNDISPUTED FACTS[3]

**A. Parties**

Plaintiff Michael Kissick is an adult resident of Madison, Wisconsin.   He is employed by the University of Wisconsin as an assistant professor.

Defendant Michael Huebsch is the Secretary of the Wisconsin Department of Administration.   The Department of Administration is responsible for management of government buildings, including the State Capitol, under Wis. Stat. § 16.84(1) and its implementing rules found at Wis. Admin. Code Chapter Adm 2 ("Adm 2").   Defendant David Erwin is the Chief of the Wisconsin Capitol Police, a division of the Department of Administration that enforces rules governing the State Capitol and its grounds.

---

[3] Except as specifically noted, the following is a summary of the undisputed facts taken from the parties' proposed findings of fact, responses to the proposed findings, affidavits, and other filings submitted by the parties.

### B. Capitol rotunda

The massive scale of Wisconsin's State Capitol rotunda is difficult to capture in words alone.  Just three feet shorter than our nation's Capitol in Washington D.C., it is the largest dome by volume in the United States and one of the largest in the world.[4]  *See* www.wi.gov/state/capfacts/cap_3d_s.html (last visited July 3, 2013).  Principal architect George B. Post designed the rotunda to be the center of public interaction among the three branches of state government, the county and city, the University of Wisconsin and the public by constructing four massive wings around it, opening onto four major streets of the City of Madison:  East and West Washington Avenue, which is the central route through the isthmus; State Street, which leads directly to the heart of the University campus; and Martin Luther King, Jr. Blvd, where city and county government are still based.  *Id*.; *Nomination* at 10-12, 30-34.  Each wing is 125 feet wide, 84 feet wide and 187 feet long.  The west wing houses the State Assembly; the east wing the Governor's Office and formal conference room and the Wisconsin Supreme Court; the south wing the State Senate; and the north wing, the North and Grand Army of the Republic Memorial Hearing Rooms.  *Id.*

---

[4]  Completed in 1915, the dome is the focal point of the Capitol building and, by state law, the highest point within one mile, making it the focal point of the City of Madison.  Sited on high ground on a narrow isthmus between Lakes Mendota and Monona, it rises 162 feet above the Capitol's four wings.  The inner or coffered dome and the exterior granite dome, separated by a steel superstructure, was an architectural marvel when built and remains the only granite dome in the United States.






As described in the June 10, 2000, "Nomination of the Capitol as a National

Historic Landmark," there is a

> clear demarcation between public and private spaces, [that] is
> central to the development of Post's scheme for the Capitol
> interior.  The public spaces, such as the rotunda, chambers
> and major corridors, are monumental in scale and are
> characterized by ornate decoration, rich materials and lavish
> details.  The private offices, designed with the goal of making
> them adaptable to changing needs, are constructed at a
> smaller and more intimate scale.

*Nomination* at 3.

As specified in the original building program, the Capitol is "in the form a St.

Andrew's Cross, providing a double axial configuration that welcomes state citizens to

walk beneath the four classical porticos and enter the halls of government." *Id.* at 34. Indeed, the Nomination argues persuasively that the design was intended to embody Wisconsin's then-contemporaneous "Progressive" movement, articulated by the state's governor, Robert M. La Follette, Sr., as the pursuit of fair and open government informed by an educated, politically-involved citizenry and the "Wisconsin idea."[5] *Id.* at 32-34.

There are actually two general gathering places under the dome. Visitors may enter at the street level and proceed to the ground floor of the rotunda, where tourists congregate inside the inner-most colonnade at the very center of the building.[6] In the winter, the ground floor is home to an extraordinarily large "holiday" tree which blocks direct east/west and north/south pedestrian traffic through the rotunda, as do regularly scheduled and impromptu tours of between 10 and 155 visitors. *See* http://www.doa.state.wi.us/events.asp?locid=4 (last visited July 3, 2013).

The first floor circular rotunda provides the other meeting space. Overlooking the ground floor, which offers access via grand staircases to each of the four wings of the building, as do recessed and outside stairs, the first floor rotunda itself "can seat a maximum of 200" according to Wisconsin Department of Administration regulations. (Access Policy, dkt. #51-3, at 19.) The Department has determined that the ground

---

[5] As articulated by La Follette's University of Wisconsin classmate, colleague and later University President, Charles Van Hise, the "Wisconsin idea" meant for the University that "[t]he boundaries of our campus are coextensive with the boundaries of our state." A. Hove, *The University of Wisconsin: Pictorial History* 70 (UW Press 1991).

[6] This center area, located directly under the dome, is surrounded by two concentric circles of columns. The area between the two circles forms a corridor that provides access to the stairways and offices in all parts of the building, even when the center of the ground floor rotunda or inner circle of the first floor are occupied.

floor "rotunda corridors and first floor corridors do not work well for large groups or large events, but may be appropriate or work well for small groups or short events." (*Id.*) The Department website indicates that regular events occurring on the first floor of the Capitol rotunda include:  American Red Cross blood drives, the State Superintendent's State of Education Address, Friends of Education and Teacher of the Year Recognition, the Wisconsin Department of Public Instruction School Recognition Awards, Veteran's Day ceremonies, annual Kiwanis Clubs Christmas pageants and choral concerts.   (*See* www.doa.state.wi.us/events.asp?locid=4

(last visited July 3, 2012)).

## C. Wisconsin Administrative Code chapter Adm 2

Administrative rules requiring a permit for public events in the State Capitol have apparently been in existence since at least 1979,[7] and have been codified at Adm 2 since February 6, 1998.  (*See* 1998 Adm 2, dkt. #51-1.)  The 1998 version of Adm 2 allows the Department of Administration, "as managing authority of the state office buildings and facilities" to "permit building and facilities to be used . . . for the purpose of governmental business, public meetings for the free discussion of public questions, or for activities of a broad public purpose" subject to reasonableness considerations.  (*Id.* at § 2.04(1).)  Members of the public seeking to use the building for such activities are instructed to "complete a written application to the department at least 72 hours in advance." (*Id.* at § 2.04(2).)  Beyond this, the rules provide no guidance as to what size or type of activity triggers the permit requirement.

By all accounts, the 1998 Adm 2 permit requirement garnered little controversy over most of its lifetime.  There is no evidence that citations were ever issued for holding an event without a permit until recently.  (Barica Aff., dkt. #20, ¶15.)  Between 2006 and 2013, the number of applications processed annually hardly varied, ranging "between 430 and 517 permits requests per year." (*Id.* at ¶11.)  Furthermore, "[e]very Chief [of the Capitol Police] has granted the vast majority of the permit applications received." (*Id.* at ¶7.)

---

[7]  So defendants' counsel represented at the injunction hearing.  (*See* Hearing Tr. (dkt. #62, 59:12.)  No formal evidence of this can be found in the record, but the court accepts the proposition -- not objected to by plaintiff -- as true for purposes of this opinion.

### D. Adoption of State Facilities Access Policy and amendments to Adm 2

Despite the comparative success of the permitting requirement set forth in Adm 2, in November 2011, the Department of Administration found it necessary to issue a State Facilities Access Policy ("Access Policy") as supplemental guidance to the public.  The Access Policy purports to give a comprehensive explanation of the rules governing use of the Capitol, and it contains numerous specific restrictions not found in Adm 2.

When Kissick filed this lawsuit, the operative law governing the Capitol was Adm 2 (last revised in 1998), as interpreted by the Access Policy (last revised in December 2011).  However, on April 11, 2013, just days before the court's preliminary injunction hearing, the state approved "emergency" modifications to Adm 2, altering some provisions that are directly relevant to Kissick's claims.  At the same time, the Department made corresponding revisions to the Access Policy.  For purposes of this opinion, the court will consider the April 2013 versions of Adm 2 and the Access Policy to be the relevant law.

The Access Policy requires the public to apply for a permit in advance of "any performance, ceremony, presentation, meeting, rally, organized tours not led by department or legislative staff or officials, festival, reception or the like held in public areas of state facilities or buildings."  (Dkt. #51-3, §§ I.B, II.A.)  Expressly exempted from the permitting requirement are: (1) "informal tourist activities"; (2) "constituents or members of the public visiting elected officials otherwise conducting routine business with any state agency or state entity"; (3) "spontaneous" events, defined as "any gathering of people for the purpose of actively promoting any cause, whether by

9

conducting a picket, parade, demonstration or the like" in "response to an unforeseen triggering event that has occurred within the preceding three [] calendar days"; (4) any event on the Capitol lawn expecting fewer than 100 people; and (5) any rally (meaning a "gathering of people for the purpose of actively promoting any cause") inside the Capitol consisting of fewer than four people.  (Dkt. #51-3, §§ I.B, I.G, II.A, III.J, IV.)  The Policy gives the Capitol Police responsibility to grant or deny permits, assess law enforcement fees to permittees, and decide when such fees will be charged in advance.

### E.  Events of February 2011

In February 2011, individuals and groups from around Wisconsin gathered in Madison to protest recent legislation changing collective bargaining rights of most public employees, as well as other issues of intense public debate.  Protests both inside and outside the State Capitol continued into the spring.  Along with other activities, singing emerged as popular form of protest.  Some of this singing became known as the "Solidarity Sing Along."  Participants in the Sing Along gathered in the Capitol rotunda at noon on most weekdays, and Kissick joined the Sing Along from time to time, when his schedule permitted.  Although the Sing Along did not have a permit to gather in the rotunda, Kissick received no tickets, arrests or warnings from Capitol Police for engaging in these activities before September 13, 2012.

### F.  Events of July - September 2012

Chief David Erwin was appointed Chief of the Wisconsin Capitol Police in July 2012.  By that time, the scale of protests had diminished from tens of thousands occupying the Capitol grounds (and thousands within the Capitol rotunda) for weeks on end to a few hundred on the grounds (and substantially less than one hundred in the rotunda) for a few hours at a time.  Nevertheless, the Wisconsin State Journal reported on August 28, 2012, that Erwin had announced plans to "begin clamping down on protesters, strictly enforcing the Capitol's rules in an effort to restore normalcy and safety to a building that has become home to regular demonstrations."  (Journal Article, dkt. #6-8, at 2-3.)  Erwin was directly quoted as saying: "'We have to manage this space.' . . . 'People love this building.  And they want to come here, and some want to petition the government, and that's great.  I support that 100 percent.  Just get a permit.'"  (*Id.* at 3.)

Beginning in early September 2012, Capitol Police began arresting protestors in the Capitol and issuing citations for alleged violations of § Adm. 2.14(v) for engaging in a rally without a permit.  On September 13, 2012, Michael Kissick went to the Capitol rotunda intending to join in the Sing Along, and found Capitol Police issuing tickets to Sing Along participants.  When Kissick asked Capitol Police officers what he could do to avoid getting a ticket, he was told that anyone "with the group" could be ticketed.  Because of the threat of citation or arrest, Kissick has stopped participating in protest activities inside the Capitol.

11

Kissick eventually brought this action for declaratory and injunctive relief, seeking to strike down as unconstitutional all or part of Adm 2 and the Department of Administration's State Facilities Access Policy. [8]

OPINION

Plaintiff's complaint consists of three claims, but his brief in support of the instant motion for a preliminary injunction suggests at least five, distinct legal challenges to the Access Policy:  (1) the Access Policy unconstitutionally vests the Capitol Police with unfettered discretion over who may obtain and who must pay for permits; (2) the ordinance is an invalid prior restraint on speech; (3) the Policy is overbroad and vague; (4) the content-based distinction between rallies and other events cannot survive strict scrutiny; and (5) imposing a permit requirement on events as small as one person does not serve a significant governmental interest in a narrowly tailored way as a time, place and manner restriction on conduct.

## I.  Standing

Defendants have not questioned plaintiff's standing to sue, but because "judges must consider jurisdiction as the first order of business," *Sherman v. Cmty. Consol. Sch.*

_____

[8]  Kissick's complaint is directed at the overall permit scheme, which is authorized by Adm 2 and set out in the State Facilities Access Policy.  The Access Policy contains significantly more detailed permitting restrictions than are found in Adm 2, and some aspects of Kissick's constitutional challenge apply to restrictions found only in the Access Policy.  However, because neither side has attempted to draw distinctions between the two documents, for purposes of this opinion the court will refer to the challenged permitting scheme under both Admin 2 and the State Facilities Access Policy collectively, as the "Access Policy" or "Policy."

*Dist. 21*, 980 F.2d 437, 440 (7th Cir. 1992), the court begins by confirming that it is confronted with justiciable issues. The three "constitutional" prongs of standing analysis require that: (1) plaintiff suffered an "injury in fact;" (2) a "causal connection" between the injury and the conduct or law complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiff undoubtedly has standing to challenge the Access Policy's permitting requirement as a valid time, place and manner restriction on speech. The requirement has caused him a tangible injury in that he cannot attend unpermitted Solidarity Sing Alongs in the Capitol without risk of arrest and citation.[9]  See *Brandt v. Village of Winnetka, Ill.*, 612 F.3d 647, 649-50 (7th Cir. 2010) (pre-enforcement challenges can meet standing requirements; a prospective injury need not be certain). Striking down the permitting requirement would redress this injury.

Plaintiff also contends that the Access Policy is a prior restraint that gives unfettered discretion to the Capitol Police to grant, deny, or impose conditions on a permit. Since he has never actually applied for a permit and alleges no specific reason to fear that the Capitol Police will use their discretion in a content-discriminatory way, plaintiff's "unfettered discretion" claim is seemingly not ripe, as it lacks a predicate actual

---

[9] Plaintiff's concern is "watered down" by defendants' representations at the preliminary injunction hearing that Adm. 2.14(2)(vm) requires the Capitol Police to first warn participants like plaintiff that they are part of an unlawful assembly and give them an opportunity to leave before issuing a citation or initiating arrest, but the court accepts on its face for standing purposes plaintiff's testimony that this was not his experience and that the general prohibitions and the substantial penalties may be enough to have reasonably chilled his willingness to participate in generally protected First Amendment speech and assembly.

or anticipated injury.  Still, for standing purposes it is injury enough to one who would apply for a license that licensing officials enjoy unchecked power -- the very threat of arbitrary exercise has a chilling effect on speech.  *See Freedman v. State of Md.*, 380 U.S. 51, 56 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not . . . he applied for a license."); *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988).  Assuming, for standing purposes only, that the Access Policy actually grants "unfettered discretion," plaintiff has suffered the necessary injury to allow his claim to proceed.[10]

A closer question is whether plaintiff has standing to attack the preference for "rallies" in the Access Policy on grounds that it is both unconstitutionally vague and an unjustified content-based distinction.[11]  To the extent plaintiff wishes to express himself by *participating in the Solidarity Sing Along*, he has never been and is unlikely to ever be injured by either of these two asserted constitutional deficiencies.  Both sides agree that there is no confusion that the Solidarity Sing Along is a "rally" requiring four or more people to participate before a permit is required.  Therefore, any vagueness inherent in

---

[10]  In some cases, courts will determine whether an ordinance actually grants "unfettered discretion" as part of the standing analysis, reasoning that if there is no such grant then as a matter of law the plaintiff has not been injured.  *E.g., Granite State Outdoor Advertising, Inc. v. City of Clearwater, Fla.*, 351 F.3d 1112, 1117-18 (11th Cir. 2003).  Rather than belabor any further this standing analysis in the abstract, the court will temporarily assume an injury and take up the question again as part of its discussion of the merits of Kissick's claims.

[11]  A "rally" is defined as "any gathering of people for the purpose of actively promoting any cause, whether by conducting a picket, parade, demonstration or the like."  (Access Policy, dkt. #51-3, at § I.F.)  Rallies of three or fewer people need not be permitted, but all other events – regardless  of size – require a permit.

the statute has not directly impacted plaintiff, and the content-based preference for rallies has inured only in his favor.

What saves plaintiff's legal challenge based on theories of vagueness and content preference is his assertion that he sometimes expresses himself in the Capitol on his own, *apart from the Solidarity Singers*. (*See* Compl., dkt. #1, at ¶29 ("Plaintiff Michael Kissick periodically went to the Capitol during time off of work or on his way to or from work and carried signs and sometimes participated with the Solidarity Sing Along.").) Applied to plaintiff's individual speech, the ambiguous definition of "rally" -- and the risk of being fined for falling outside the definition of "content-based speech" without a permit -- presents the sort of "concrete and particularized chilling effect" required for standing to bring a vagueness challenge. *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012). Similarly, the alleged distinction between individual speech "promoting a cause" (no permit required) and other speech (only with a permit) works direct injury to plaintiff insofar as it attempts to shape the content of his speech in the Capitol.

## II. Motion for preliminary injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In an attempt to minimize the harm from potential error, the court must employ a "sliding scale" approach to these questions, which means that the higher the probability that

plaintiff will win, the less heavily the balance of harms must weigh in favor of granting the injunction, and vice-versa. *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir. 2009).

Defendants concede the second and fourth factors, as it is well-established under Seventh Circuit law that the "loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

## A.  Likelihood of success on the merits

A showing of likelihood of success requires only that plaintiff present a "plausible claim on the merits." *Hoosier Energy*, 582 F.3d at 725.  In weighing this likelihood of success, the court notes that the burden of proof in free speech challenges rests on the government. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816-17 (2000).

### 1.  Unfettered discretion

Plaintiff begins with the claim that the Access Policy gives virtually unlimited discretion to the Capitol Police to deny any applicant a permit to hold an event in the Capitol, as well as to condition any permit on payment of an arbitrary fee for "law enforcement expenses."[12]  If plaintiff is correct, the Policy is invalid, for "[i]t is well

---

[12]   An "unfettered discretion" challenge "may be conceptualized as simply a manifestation of the overbreadth or vagueness doctrines, or as a free-standing principle all its own."  Rodney A. Smolla & Melville B. Nimmer, *Smolla and Nimmer on Freedom of Speech* § 6:16 (2013).  For purposes of this opinion, the court analyzes the claim separately.

established that where a statute or ordinance vests the government with virtually unlimited authority to grant or deny a permit, that law violates the First Amendment's guarantee of free speech." *MacDonald v. City of Chi.*, 243 F.3d 1021, 1026 (7th Cir. 2001).  As the Seventh Circuit explained, "where virtually unlimited discretion exists, 'the possibility is too great that it will be exercised in order to suppress disfavored speech.'"  *Id.* (quoting *MacDonald v. Chi. Park Dist.*, 132 F.3d 355, 361 n.6 (7th Cir. 1997)).

Under the Access Policy, the Capitol Police have been given at least five-fold decision-making authority to issue or deny permits:  they may deny permits outright; choose between conflicting permit requests; require pre-payment of police fees upfront as a condition for a permit; charge permitted parties for the cost of providing extra law enforcement; and delay issuing a permitting decision for up to 30 days.  In plaintiff's view, the Capitol Police have been given unfettered authority to make each of these five decisions, and thus the ability to discriminate against a disfavored applicant's proposed speech.  The court concludes otherwise, since in each respect the Policy provides adequate guidance and does not allow the Capitol Police to discriminate based upon speech content.

### a.  Power to grant and deny permits

The power to grant permits is found in Section VI, which enumerates the specific factors the Capitol Police must consider, including "if the requested use would interfere with the primary purposes of the building . . . . if the requested use poses a substantial risk of financial loss to the State . . . . if the requested use would conflict with planned

17

programs organized and conducted by the Department, a State agency, or a State official, which has been previously scheduled for the same time and place . . . [and] if the requested use would present an unreasonable danger to the health or safety of the user or other user of the facility." The full list of considerations contains no invitation or allowance for any judgment based on speech content. The only arguable exception is the last of the above-quoted factors, because a highly controversial message might be deemed to "present an unreasonable danger to the health or safety of the user" due to potentially violent audience backlash to the message. There may also be room for troubling discretion in applying a factor like interfering with "the primary purpose of the building" depending upon how narrowly the business of the people of Wisconsin is defined in practice.

However, each of these considerations is expressly foreclosed by § VI.A, which states that "[p]ermits may not be denied on the basis of the content the speech, the event or the exhibit." The Capitol Police must be able to justify any permit denial as falling both within one of the enumerated factors in Section VI and outside the prohibition on content-based discrimination. With these specific standards in place, there is, at least facially, the required "narrowly drawn, reasonable and definite" guidance constraining the discretion of the police in granting or denying a permit. *Niemotko v. State of Maryland*, 340 U.S. 268, 271 (1951).[13]

---

[13] Of course, finding that the Policy does not violate the First Amendment on its face is different from finding that it does not do so *as applied*. At this point, however, it is only the former that plaintiff is challenging.

18

### b. Power to choose between conflicting permit requests

The Capitol Police are even further restricted in their ability to discriminate between competing permits.  Section V.A of the Policy provides that "requests from the public are processed on a first-come, first-served basis."  Section VI.C provides that "[p]ermits may be denied or limited if the requested use would conflict with a previously granted permit."  Under these rules, the police have *no* discretion to favor one of two competing permits -- the first-filed automatically takes precedence.  As for the determination of whether a second-filed permit presents a conflict with the first, the police are again bound by the constraint under § VI.A that "[p]ermits may not be denied on the basis of the content of the speech, the event or the exhibit."  As above, the burden falls upon the Capitol Police to point to a legitimate conflict over space, volume or the like that would show the decision has been made without regard to the content of the speech.  At least as to plaintiff's facial challenge, the court is satisfied that this requirement adequately constrains the discretion wielded by the police.

### c. Power to charge for law enforcement and power to require an advance payment

Section II.E allows the Capitol Police to charge an "advance payment" for "law enforcement expenses" "as a condition for granting a permit."  The Police may also bill "[i]ndividuals or organizations that organize, sponsor, promote or participate in an event" after the fact "for recovery of law enforcement costs."  Although § II itself contains no positive criteria governing the decisions of when to charge for law enforcement or when to require pre-payment of charges, restrictions on content-based discrimination are found elsewhere in the Policy.  Indeed, the preamble to the Policy expressly prohibits

19

content-based considerations, stating that "at no time shall enforcement of these procedures be influenced or affected by . . . religion, political affiliation, or any other category that implicates content-based discrimination."   Such a restriction was found sufficient in *Ward v. Rock Against Racism*, 491 U.S. 781, 794-95 (1989) ("By its own terms the city's sound-amplification guideline must be interpreted to forbid city officials purposely to select inadequate sound systems or to vary the sound quality or volume based on the message being delivered by performers.").

The Policy also expressly exempts event organizers from "normal staffing costs" and from "costs arising out of a law enforcement response to a counter-rally," stating in part that

> [n]ormal law enforcement and staffing levels at the Capitol allow for adequate monitoring and accommodation of most events.   These normal law enforcement staffing and maintenance staffing levels do not 'arise out of the event' and are not incurred by the state 'due to the event.'   Therefore Section II.D. and II.E. shall not be interpreted to require permittees to pay for such regular and normal staffing costs.

(Dkt. #51-3, § II.U.)

Responding to plaintiff's concern about liability for staffing costs that are not "regular and normal," defendants' counsel further represented at the preliminary injunction hearing that a proper reading of the Policy allows for law enforcement costs to be assessed only after the fact if incurred in response to unlawful activity.   As for discretion to require pre-payment, § II.U of the Policy notes that "[h]istorically advance charges have only been required . . . where a permittee has failed to pay uncontested

20

costs from one or more prior events."[14]  Against this backdrop, any imposition of fees can readily be judged for content neutrality, with State Capitol Police bearing the significant burden of providing a legitimate, content-neutral explanation for doing so.

### d.  Power to delay issuing a permit

Finally, § VI of the Policy, entitled "Permit Decisions and Appeals," controls the discretion of the Capitol Police as to how long it may take to decide whether to grant or deny permit applications.  The section states in pertinent part that:

> State Capitol Police shall process permits as expeditiously as possible.  Permits shall be processed in the order received.  Generally, permit requests are granted or denied within ten (10) business days.  Permit requests for events which are likely to require additional or police resources, or which may have commercial implications, may take longer to review. All permit requests shall be granted or denied within thirty (30) days of receipt.
>
> . . .
>
> If a person or organization is aggrieved by a decision of the State Capitol Police staff, an appeal may be taken to the Chief of State Capitol Police within three (3) business days of that decision.

(Dkt. #51-3, at 13-14.)

While the Access Policy undoubtedly allows the Capitol Police enough freedom to suppress disfavored speech by delaying a decision on a given permitting application, it is

---

[14]  Susan C. Barica, Executive Staff Assistant to the Chief of Police since 1991, avers that a select few, large-attendee events (e.g., Taste of Madison, Winterfest, etc.) have agreed ahead of time to pay for extra police protection.  (*See* Barica Aff., dkt. #20, ¶12-13.) Barica also avers that in the past decade the only user that has been required to pay for law enforcement costs in advance was the 2008 Barack Obama Presidential Campaign, and then only because of an outstanding bill left unpaid by the John Kerry Presidential Campaign. (Barica Aff., dkt. #20, ¶¶9-10, 14.)

not facially unconstitutional to allow Capitol Police up to 10 days to issue "most" decisions.  What is more, the police may not exercise unlimited discretion -- they *must* make permit decisions within 30 days and are told that "at no time shall enforcement of these procedures be influenced or affected by . . . religion, political affiliation, or any other category that implicates content-based discrimination."[15]

Although the "opportunities for abuse are manifest" in almost any permitting process, these "are minimized by the fact that if there is abuse the victims can bring a judicial challenge to the permit regulation as applied to them."  *Thomas v. Chi. Park Dist.*, 227 F.3d 921, 926 (7th Cir. 2000), *aff'd by Thomas v. Chi. Park Dist.*, 534 U.S. 316 (2002).  Any "abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements."  *Thomas*, 534 U.S. at 325.

### 2.  Prior restraint

Plaintiff's call to strike down the Access Policy as a "prior restraint" requires little discussion in light of *MacDonald v. City of Chi.*, 243 F.3d 1021 (7th Cir. 2001).  In that case, the Seventh Circuit surveyed Supreme Court precedent addressing licensing and permit schemes related to expressive activity on public property, noting that only some decisions analyzed the schemes as "prior restraints."  *Id.* at 1029.  The *MacDonald* Court observed that

> [w]hat distinguishes the Court's treatment of licensing

---

[15] Some discretion is always necessary and appropriate, and the flexibility to go up to 30 days reasonably accounts for realistic fluctuations in workload and the fact that complicated permit requests will take longer to investigate and organize, at least on the face of the Policy.

> schemes in these [cases with varying outcomes] . . . is the presence of unfettered discretion . . . . This type of discretion, in the Court's eyes, "gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Lakewood*, 486 U.S. at 759, 108 S.Ct. 2138. It also presents the possibility of self-censorship. *Id.*

243 F.3d at 1030.  The *McDonald* court's determination that the presence of unfettered official discretion is what makes a law a prior restraint finds further support in *Thomas v. Chi. Park Dist.*, which held that the prior restraint test is only a "helpful formula" when the purpose of a licensing scheme is to censor content.  227 F.3d 921, 923 (7th Cir. 2000).  More recently, the Seventh Circuit held that a restriction on speech is a prior restraint only if . . . "the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication."  *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008).

Whatever might be the risks in its application, the permitting scheme set forth in writing in the Access Policy is not primarily content-focused.  To the contrary, it purports to prohibit the Capitol Police from granting or denying permits based on the content of the proposed speech.[16]  The thrust of the Policy is plainly directed at mediating competing uses on state property, not imposing censorship on content or viewpoint.  For this reason the court does not consider the Access Policy to be a "prior restraint."  It will therefore disregard plaintiff's argument that the Policy lacks the procedural requirements

---

[16]  As discussed below, there is a small, discrete allowance for speech that "promotes a cause" in terms of the size of the group that must obtain a permit, but the court will enjoin defendants from enforcing that provision.

for prior restraints set out in *Freedman v. Maryland*, 380 U.S. 51 (1965).  *See Thomas*, 534 U.S. at 322 ("We have never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in *Freedman*.").

### 3.  Overbreadth and vagueness

In *Secretary of State of Maryland. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947 (1984), a plurality of the Supreme Court observed that the term "overbreadth" has been used in two ways:  first, "to describe the [specific] doctrine that allows a litigant whose own conduct is unprotected to assert the rights of third parties to challenge a statute [on its face], even though 'as applied' to him the statute would be constitutional"; and second, in a much more general sense, "to describe a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve [the appropriate level of] governmental interest."  *Id*. at 967 n.13.  When the term "overbreadth" is used in the complaint in this case, it appears to refer to the second, and broader, of these two meanings, since it is describing the lack of narrow tailoring in the Access Policy as a time, place and manner restriction.  (*See* Compl., dkt. #1, ¶45.)  If plaintiff meant to raise an overbreadth challenge in the first sense of the word, he has failed to sufficiently advance the argument; in any event such an argument would merge with his vagueness challenge, an analysis of which follows.

"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."  *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).  Facial vagueness challenges fall into two categories.  On the

24

one hand, facial challenges to regulations that do not threaten the exercise of First Amendment (and perhaps other fundamental) rights are strongly disfavored, unless the plaintiff can show that the law is unconstitutional in every possible application. *See United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (*en banc*) (explaining that a statute that does not implicate First Amendment rights can be "assessed for vagueness only 'as applied'"). On the other hand, facial challenges to regulations that burden First Amendment rights may be struck down on their face provided the plaintiff can show that they "reach[] a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S. Ct. 1186, 1191 (1982).

For challenges in the latter category, in which this case falls, a plaintiff must show that vagueness in the language of the law so enlarges the scope of its prohibition or restriction that it has a "deterrent effect on legitimate expression" that is "both real and substantial." *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976). Improper expansion into areas of constitutionally-protected expression may occur either because the law (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, ⸺ U.S. ⸺, 132 S.Ct. 2307, 2310 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

Plaintiff's challenge centers on the Access Policy's regulation of a "rally," which is defined as a "gathering for the purpose of actively promoting a cause." Plaintiff maintains that this definition is impermissibly vague because it is impossible for a person

25

of reasonable intelligence to determine whether any particular group of persons who may independently arrive at the Capitol would meet this definition.  He argues that the concept of "promoting a cause" and the concept of a "gathering" are both vague.  The court would tend to agree (particularly as to determining whether one is engaged in the promotion of a "cause" versus other legitimate expression), but again need not dwell on this issue because any attempt to arrive at nuanced distinctions ignores the larger problem:  defendants have offered no justification for different time, place and manner restrictions based on the content of the speech.  Accordingly, the Access Policy must treat rallies the same way it treats "any performance, ceremony, presentation, meeting . . . festival, reception or the like."  (Revised Access Policy, dkt. #51-3, § I.B.)

In the same vein, plaintiff has expressed a more general concern about deterring those who would like to express themselves while on state property but who are unsure about whether their actions constitute an "event."  This is mostly a hypothetical rather than realistic concern -- if one is not in the rotunda as a tourist, on the way to work in one of the Capitol's four wings, or any of the few other exceptions to the permit requirement, it is hard not to posit why one *would* be there except to conduct or participate in an "event."  It is possible, perhaps, that a person who comes to the Capitol as a tourist might decide after arriving to give a "presentation" or conduct a "rally," or join in an existing event, but reasonable time, place and manner regulations of such a person would be constitutional.

As for the curious tourist who is mistakenly identified as an "event" participant, the risk of being arrested or fined because of confusion over the permitting requirements

is essentially foreclosed by Administrative Rule sections Adm. 2.14(2)(vm). Subparagraph (vm) says that "[a]ny participant or spectator within a group constituting an unlawful [event], who intentionally fails or refuses to withdraw from the [event] *after it has been declared unlawful*, shall be subject to the penalties." (Emphasis added.) In other words, before an individual can be punished under the Policy, the Capitol Police must give notice to that person that the event is unpermitted *and* that they are considered a participant. At that point, one who has been mis-identified can easily withdraw. For these reasons, the court concludes that the Access Policy's permitting scheme does not, by reason of vagueness, reach "a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Estates*, 455 U.S. at 494.

### 4. Content-based restrictions on expressive activity

Plaintiff's fourth claim is that the Access Policy discriminates on the basis of the content of a permit applicant's message. "As a general rule, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral," but "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994). "[T]he mere assertion of a content-neutral purpose [will not] be enough to save a law which, on its face, discriminates based on content." *Id.* at 642-43.[17]

---

[17] Under some formulations of the content neutrality test articulated by the Supreme Court, a facial prohibition or restriction on certain types of content does not equate to content discrimination if the government's stated *purpose* is content neutral. For example, in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), the Court held that the "government's purpose is the controlling consideration. . . . [R]egulation of expressive

Plaintiff advances three arguments contending that the Access Policy contains content-based distinctions.  The first argument is that the Policy invites the Capitol Police to charge permit applicants a variable amount for law enforcement costs, depending on the applicant's proposed message.  The court has already rejected this argument as it pertains to an asserted lack of standards in permitting decisions, but plaintiff also seems to be arguing that the policy affirmatively instructs the Capitol Police to charge more for policing controversial messages.  In this way, plaintiff would draw parallels to *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123 (1992), which struck down an ordinance that allowed police to charge applicants for the cost of protecting them from negative public reaction to the content of their speech.  *Id*. at 134-36.

*Forsyth* stands for the proposition that an ordinance is "content based" as long as it permits a "determination of an event permit fee grounded on content, even if pegged to anticipated administrative expense or the cost of maintaining public order."  *Surita v.*

---

activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'"  *Id.* at 791 (quoting *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 (1984)); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (finding laws that restricted certain types of expression "content neutral" because the purpose was only to regulate the secondary effects of the expression).  Other Supreme Court cases distinguish the ordinance in *City of Renton* as a very narrow exception, and emphasize that in most cases the justification for a law is irrelevant.  *E.g., Turner*, 512 U.S. at 642-43 ("While a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to make such a showing in all cases.  Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content.").  The latter is certainly the case here, since either test could be met: the policy contains content-based distinctions and defendants conceded at the preliminary injunction hearing that the one-person/four-person distinction was a product of the state's interest in promoting political speech in the Capitol.

28

*Hyde*, 665 F.3d 860, 876 (7th Cir. 2011).  This comparison to *Forsyth* is inappropriate, since as previously discussed the Access Policy expressly bars the Capitol Police from considering the content of the proposed speech in any respect and exempts applicants from any costs of oppositional activity or "counter-rallies."  (Dkt. #51-3, at 5-6.)

Plaintiff's second argument is that the Policy's express exceptions for "informal tourist activities," "constituents or members of the public visiting elected officials," or "otherwise conducting routine business with any state agency or state entity" amounts to a content preference.  To the contrary, these are categories of non-expressive conduct, insofar as there is no speech component to walking around the Capitol as a tourist or passing through the public spaces of the Capitol to private offices -- although some incidental speech may occur in the course of such activities.  An exception for this limited subset of conduct is presumably made because it does not require special oversight, being especially frequent, non-disruptive and short-lived.  Moreover, these exceptions reflect no content preference, and one could easily determine *simply based on a person's conduct* whether they are in the Capitol as a casual tourist or passing through to a private office, rather than for purposes of a performance, rally, or event.

Plaintiff has more success with his third argument, which maintains that content discrimination is built into the permitting scheme in the form of a preference for rallies over other events.  As a baseline, the Policy provides (with irrelevant exceptions) that permits are required for any "performance, ceremony, presentation, meeting, rally, organized tours not led by department or legislative staff or officials, festival, reception or the like" occurring in any area inside or outside of a State building.   But at § 3.J it

exempts "any gathering of people for the purpose of actively promoting any cause," so long as the "rally" contains three or fewer participants.

In light of this exemption, the Access Policy on its face favors speech aimed at "promoting a cause," and therefore contains a content-based distinction. This is no less the case because the Policy provides more favorable treatment for cause-promoting speech; one could just as accurately say that the Policy *disfavors* speech that does not promote a cause, and any sort of distinction between categories of protected speech is enough to label a regulation "content-based." *See Schultz v. City of Cumberland*, 228 F.3d 831, 840-41 (7th Cir. 2000) ("A general ban on speech in the vicinity of a school is content-neutral, whereas an analogous ban on speech containing an exemption for speech relating to labor disputes is content-based. The former regulation requires no consideration of content before applying the ban, while the latter regulation requires consideration whether the speech in question refers to a labor dispute before it is possible to determine if the regulation applies." (internal citations omitted)).

The Wisconsin State Capitol may be thought of as either a traditional or a designated public forum.[18] In either type of forum, content-based discrimination against speech is subject to strict scrutiny, meaning that the "content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry Educ. Ass'n v. Perry Local*

---

[18] Although there is some disagreement between the parties as to whether the Capitol should be considered a traditional or designated public forum, the court need not decide that issue at this point, because the two are treated essentially the same with respect to content-based restrictions. "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 96 (1972).

*Educators' Ass'n*, 460 U.S. 37, 46 (1983).   Although the Wisconsin Department of Administration was likely acting in a good faith effort to favor core, political speech when it relaxed the permitting requirements slightly for cause-promoting speech, the Department does not advance any compelling governmental interest supporting this content-based distinction, nor does it adequately explain how the distinction is narrowly tailored to serve this interest.   Therefore, the Access Policy's preference for speech that "promotes a cause" is likely to be found unconstitutional.

This is not to foreclose completely the notion of some kind of preference for cause-promoting speech over disinterested speech in the Capitol.   Certainly, First Amendment jurisprudence recognizes the fundamental importance of political speech to our system of government.  *See Buckley v. Valeo,* 424 U.S. 1, 14-15 (1976); *Pickering v. Board of Educ.*, 391 U.S. 563, 571-72 (1968) (recognizing a public employees' First Amendment right to address matters of "legitimate public concern").  With the exception of commercial speech, however, the United States Supreme Court has repeatedly declined to draw distinctions between or extend a lower level of protection to certain kinds of speech.  *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984) ("[E]ven though political speech is entitled to the fullest possible measure of constitutional protection, there are a host of other communications that command the same respect. . . . To create an exception for appellee's political speech and not these other types of speech might create a risk of engaging in constitutionally forbidden content discrimination.").  Given the historic character of the Capitol and its rotunda as a forum particularly given over to persuasive and political speech, the court does not rule

31

out the notion that the state *could*, for example, favor the Solidarity Sing Along over the Pro Arte Quartet.  The court holds only that defendants have not yet met their burden of proof to uphold drawing a line based on the content of the speech in this case.

### 5.  Content-neutral restrictions on expressive activity -- the time, place and manner test

Having concluded that the Access Policy contains a content-based distinction, plaintiff seems to argue that the court must apply strict scrutiny when analyzing all aspects of the Policy, including the general requirement that every "event" in the Capitol obtain a permit.  This is not so.  Like many regulations and ordinances, the Access Policy comprises a collection of interrelated, but analytically separate, sub-rules.  These sub-rules are linked insofar as the invalidity of one may render unconstitutional an entire ordinance if it cannot be severed (a question the court addresses later in this opinion), but to know whether a given sub-rule passes constitutional muster, one must analyze it on its own merits.  *See Schultz*, 228 F.3d at 846 (analyzing individual sections of a city ordinance separately to determine if content-neutral).  Considering separately just the general permitting requirement of the Access Policy for all events regardless of size, this provision appears content neutral.  The government may impose any reasonable restriction on the time, place, or manner of protected speech, so long as it is "justified without reference to the content of the regulated speech, . . . narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information."  *Rock Against Racism*, 491 U.S. at 791 (citing *Clark*, 468 U.S. at 293 (1984)).

32

### a.  Narrow tailoring to a significant governmental interest

According to its own terms, the Access Policy allows the Department of Administration to "coordinate multiple uses of public buildings, preserve public spaces, ensure the health, safety and welfare of the public, preserve the aesthetic appearance of historic buildings, and protect the public from financial losses."  (Dkt. #51-3, at 3.)  To explain the particular benefits of the Policy's permitting system, defendants presented the testimony of Todd B. Kuschel, a Captain in the Capitol Police.  Captain Kuschel testified that the permitting system was used to (1) ensure the presence of adequate police resources at the Capitol and (2) manage competing demands for public space in the Capitol.  Plaintiff concedes, as he must, that both of these are significant governmental interests in the abstract, but argues that the permitting requirement is not narrowly tailored to serve either interest insofar as it applies even to small gatherings.  Plaintiff contends that permitting of small groups is unnecessary, because such groups (1) pose little or no strain on police resources and (2) can be readily managed under existing noise and conduct ordinances.  On the limited record made by the parties' for purposes of entry of a preliminary injunction, the court is inclined to agree.

As to the assistance that permitting gives to the Capitol Police in ensuring adequate police resources for the Capitol, Captain Kuschel testified that on a typical day, the Capitol grounds are staffed with five patrol officers and a sergeant on regular duty. Assigning tasks to these six officers is made more difficult without the ability to predict when and what events will occur inside the Capitol that may require their presence.  It may take up to four or five officers (essentially the entire on-duty staff) to safely remove

one disruptive protestor who refuses to leave the building.  For this reason, Captain Kuschel opined that given the level of police staffing at his disposal, it would be highly advantageous to know in advance if groups as small as four persons will be conducting an "event" in the Capitol.

At the same time, Captain Kuschel conceded that more officers are readily available to assist the Capitol Police in extraordinary circumstances.  It is not uncommon for up to nine additional Capitol Police officers to be in the vicinity of the Capital completing administrative or detective work; plus, the Capitol Police can readily call in reinforcements from City of Madison Police Department, whose headquarters is a block away.  In fact, if things get out of hand, the Capitol Police can rely on as many of twenty or more total officers to respond to the Capitol in fairly short order.  Moreover, very few events reach a size or disruptiveness that require more than the usual compliment of six officers.  Kuschel admitted that on days when he knows the Sing Along will show up (even without a permit), he still only assigns 5 patrol officers and one sergeant to the Capitol grounds.  The Access Policy itself confirms this when it says that "normal law enforcement and staffing levels at the Capitol allow for adequate monitoring and accommodation of most events."  (Revised Access Policy, dkt. #51-3 at § II.U.)  So, too, do the large number of unpermitted groups of sizes up to 150 to 200 that regularly populate the Capitol rotunda.  For all but the largest events, the permitting system appears useful only for allocating assignments among the regular force of six officers.

As a supplement to Captain Kuschel's testimony, defendants have submitted affidavits by other Capitol Police officers and administrators.  Deputy Chief Daniel

34

Blackdeer avers that appropriate staffing is important when protestors hold events at the Capitol -- he has "specifically been concerned with the recurring interference with arrests, where groups of protestors will physically try to come between officers and those being arrested." (Dkt. #21 at ¶8.)  Blackdeer also avers that "[r]emoval of even a small number of resistant persons from the Capitol or particular areas of the Capitol can have a significant impact on the operations of the [Capitol Police] department." (*Id.* at ¶14.) Affidavits from other officers indicate that individuals known to participate in the Sing Along have caused disturbances in the Capitol requiring police intervention and removal. (*E.g.*, Aff. of David Davis, dkt. #22, at ¶¶e-g.)

Despite this evidence, defendants offer very little in the way of a *nexus* between a strict permitting requirement for small groups and the significant state interest of maintaining peace and order in the Capitol.  For example, the Capitol Police do not need a permit violation to arrest and remove individual troublemakers from the building -- they can deal with disruptive behavior by enforcing a variety of state statutes and administrative regulations governing boisterous, violent or abusive conduct.  (*See generally* Access Policy §§ II & III; Wis. Admin. Code ch. Adm 2.)

Of course, police can function more effectively and muster more quickly when they know ahead of time that a disturbance is likely to occur -- the Supreme Court has observed that the "obvious advantage" to "requiring application for a permit" is that it gives "the public authorities notice in advance so as to afford opportunity for proper policing." *Cox v. State of New Hampshire*, 312 U.S. 569, 576 (1941).  But the Court made this observation in a case involving a request for a parade permit.  A parade is almost by

35

definition likely to cause a traffic disturbance that requires police mediation.  According to Captain Kuschel's own testimony, the vast majority of events in the state Capitol, in contrast, do *not* require an extraordinary police presence.  In the absence of a disturbance, that would seem to be particularly true of smaller events.

So at what group size does it serve a substantial government interest to require advance permitting?  On the face of the Policy, the state's official answer seems to be "one" person.  In the alternative, Captain Kuschel suggested that "four" is the magic group size, perhaps because the five patrol officers and one sergeant regularly on duty are enough to remove a single protestor and at the same time prevent his or her friends from interfering with the removal.  Both estimates are apparently based on the number of police it would take to remove each participant by force after causing a disruption and then resisting law enforcement.  But that is certainly not the actual measure -- if it were, even permitted events would be staffed by between one and six police officers *per participant*, is plainly not how police staffing for the Capitol occurs in practice.

Obviously, some events and some event participants are more likely than others to produce illegal and disruptive conduct.  It surely would be helpful to the police to know when "bad elements" are likely to appear in the Capitol.  But as long as we are to remain a free society, legitimate policing ends are only indirectly served by imposing a *blanket* permitting requirement in a public forum while exerting a considerable chill on legitimate, even core political speech.

Another way to judge whether a blanket permitting requirement is narrowly-tailored to the state's interest in proper policing might be to inquire into the effect that

an event has on the allocation of the typical six, on-duty officers.  Presumably, these officers are either "event policing" or carrying out usual duties, such as assisting lost or injured visitors, preventing theft, patrolling the grounds for mischief and maintaining order in offices and at public hearings, legislative sessions, and judicial proceedings. Given these varied obligations, Captain Kuschel alluded to the benefits of knowing ahead of time what events are likely for scheduling purposes.  This also seems to be what plaintiff's witness, a former Chief of the Capitol Police, Charles Tubbs, had in mind when he testified that if "five or more people" were doing the same thing in the Capitol, it would be important to know in advance as a law enforcement officer.  Still, as long as some of the six officers can be diverted to monitor an unexpected event, while the remainder provide basic police functions for the rest of the Capitol, there is no significant policing interest in requiring that all events be permitted in advance.  Indeed, the evidence provided the court to date suggests that a peaceful event must be large indeed before that threshold is exceeded.  For example, Chief Tubbs testified that groups of 50 people or more would not ordinarily require staffing changes, unless the police had "intelligence that we're going to have interference" or other unlawful conduct.

The only other governmental interest offered by defendants to justify the permitting requirement for one or more participants is the need to coordinate access to the Capitol and prevent scheduling conflicts among events.  This is surely a valid concern, because coordinating and restricting events to their proper time, place and manner serves, rather than undermines, First Amendment interests.  *See Thomas*, 227 F.3d at 924 ("[T]o allow unregulated access to all comers could easily reduce rather than

enlarge . . . [a venue's] utility as a forum for speech.")  "[I]n fixing time and place," a license serves "'to prevent confusion by overlapping [events], to secure convenient use of the [public facilities] by other[s] . . . , and to minimize the risk of disorder.'"  *Cox*, 312 U.S. at 576.

The sides acknowledge this need, but differ over whether the tools available to the Department of Administration absent a mandatory permitting rule -- including strictly enforcing the existing noise and public disturbance ordinances -- are adequate to prevent conflicts between disparate uses of the Capitol.  Plaintiff argues that this can be accomplished with a voluntary permitting system, giving automatic preference to events that choose to apply for and obtain a permit in advance.  Defendants argue that while this sounds plausible in theory, it would be very difficult to enforce in practice.  As defense counsel put it at the preliminary injunction hearing, the idea that the Solidarity Singers and other non-permitted protestors will quietly cede the Capitol to permitted events and just "play nice is absolutely not real in the real world."  Citing Captain Kuschel's testimony and the supplementary affidavit evidence, defendants assert that in fact -- despite the best efforts of the Capitol Police -- certain unpermitted Solidarity Sing Alongs have, at times, already impeded attempts by tourists to view the Capitol, attempts by legislators to address their constituents, and attempts by others to get ordinary work done in offices throughout the building.

While the court finds some of defendants' evidence credible and the competing interests real, the problem falls well short of an adequate showing that a permitting requirement for "groups" as few as one person to engage in non-disruptive speech is a

narrowly-tailored solution.  A fair reading of defendants' evidence is that the root of the problem isn't scheduling or overcrowding, it is that certain event participants -- including some who are or seek to be affiliated with the Solidarity Sing Along -- tend to be so loud and unwilling to accommodate other legitimate uses of the building that *their* conduct needs to be regulated.  Compounding the problem is that the Capitol Police are either unwilling to enforce existing conduct rules against disruptive actors, have been unable to do so effectively because of reluctance to prosecute by other agencies, or simply need to have lower volume limits and/or higher standards of conduct.  Enforcement of truly narrowly-tailored, existing rules would directly address the problem of disruptive conduct, while defendants have failed to show "a *real nexus*" between the mandatory permit requirement for small groups and "the significant governmental interest sought to be served by the regulation."  *Cmty. for Creative Nonviolence v. Kerrigan*, 865 F.2d 382, 388 (D.C. Cir. 1989) (emphasis in original).

This court "must closely scrutinize the regulation to determine if it indeed promotes the Government's purposes in more than a speculative way," *id.* at 390, but it is not the court's role to tell the Department of Administration how best to manage the Capitol.  "[A] content-neutral restriction will not be struck down 'simply because there is some imaginable alternative that might be less burdensome on speech.'"  *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 519 (D.C. Cir. 2010) (quoting *Rock Against Racism*, 491 U.S. at 797).  Here, the current permitting requirement sweeps in an enormous amount of ordinary activities that are unlikely to present any significant disturbance in the

Capitol.[19]  It thus unnecessarily creates a chilling effect on the speech of the majority of individuals who *are* willing to follow reasonable conduct standards and co-exist harmoniously with tour groups, permitted events and other legitimate state activities.  In this respect, the restriction seems to "burden substantially more speech than is necessary to further the government's legitimate interests."  *Rock Against Racism*, 491 U.S. at 799.

Defendants have established that large, unpermitted events can be disruptive solely by dint of their size, because a sufficiently large number of people milling about or engaged in speech activities in the Capitol rotunda can impede permitted events and other ordinary activities, even if no individual in the crowd is personally violating the public disturbance and noise ordinances.  (Although one might question whether a group of 50 reasonably well-behaved protestors are likely to be any more disruptive than 150 elementary students.)  "Permitting schemes are necessary to ensure that scarce space is allocated among conflicting applicants, to protect public access to thoroughfares and public facilities, and to enable police, fire, and other public safety officials to function." *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1258 (10th Cir. 2004).  Accordingly, the court finds that the state *does* have a significant interest in requiring an advance permit for *every* event that can reasonably be expected to attract large crowds.  At

---

[19]  Consider three hypotheticals.  (1) On the first day of every month, four nuns kneel for an hour of silent prayer in the Capitol rotunda; (2) Ten National Rifle Association members meet at an agreed upon time in the Capitol rotunda after visiting their legislators, to discuss next steps in defense of the the Second Amendment to the Constitution; (3) Adam dreams up a romantic civil union proposal for his boyfriend Steve: as they pass through Steve's favorite spot, the Capitol rotunda, Adam and his friends bust into an *a capella* version of "Only You."  All three of these groups could be cited for conducting an unpermitted "event."

the same time, the one- and four-person permitting requirements currently in place are plainly not narrowly-tailored to address that interest.

In the permitting scheme's defense, it does offer a few, unique advantages in comparison to mere conduct restrictions: (1) it provides a shade more predictability for Capitol administrators, as they will be able to know when *no* other events should be taking place; (2) it allows police to anticipate a disturbance without waiting for an actual violation of a noise ordinance; and (3) it encourages groups to self-police, because those who apply for permits can be held liable for the misdeeds and law enforcement response of bad actors within their group.

Ultimately, the court concludes that as written, the permitting requirement draws in too much expressive conduct in exchange for too little administrative benefit. It is, therefore, not narrowly tailored to serve a significant governmental interest. This finding is consistent with the holdings of federal courts across the country, which have virtually unanimously struck down permitting requirements for small groups. *See, e.g.*, *Cox v. City of Charleston, SC*, 416 F.3d 281, 285 (4th Cir. 2005) ("[T]he unflinching application of the Ordinance to groups as small as two or three renders it constitutionally infirm."); *Arab-Am. Anti Discrim. Comm'n. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) ("Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring."); *Douglas v. Brownall*, 88 F.3d 1511, 1524 (8th Cir. 1996) (expressing concern about the "application of [a] permit requirement to groups of ten"); *Knowles v. Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("[O]rdinances requiring a permit for demonstrations by a handful of people are not

41

narrowly tailored to serve a significant government interest."); *Marcavage v. City of Chi.*, 659 F.3d 626, 635 (7th Cir. 2011) (noting the "powerful consensus" of courts finding "permit requirements for groups of ten and under to be either unconstitutional or constitutionally suspect").

As defendants appropriately point out, none of the above-cited cases apply to interior spaces, but the Capitol rotunda is closer to an out-of-doors, traditional public forum in that it is a capacious gathering space with a unique history as a place for government and public discourse, which admits for (indeed, was designed for) a certain level of disturbance that would not be proper in a typical state office building or even a typical state capitol. And, although its four wings are offices for many, most of this work is sufficiently remote to be impacted by small groups -- otherwise how do defendants explain the myriad events and large groups regularly parading through and gathering for events in the Capitol rotunda and its other public spaces. Moreover, the court relies on these cases not so much as a guide to the precise numerical floor below which the state cannot require a permit, but rather for a sense of the broad judicial consensus that pre-permitting schemes which limit speech in public places must serve more than just scheduling or administrative functions.

Said another way: permits chill speech. "Both the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers." *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994)).

> As a matter of principle a requirement of registration in order
> to make a public speech would seem generally incompatible

> with an exercise of the rights of free speech and free assembly.
>
> . . .
>
> . . . Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition.

*Watchtower Bible* & *Tract Soc. of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 164-66 (2002) (quoting *Thomas v. Collins*, 323 U.S. 516, 539-40 (1945)).   The extraordinary chilling effect of permits explains why courts are careful to require that "if the legislative body determines that a permit requirement is absolutely necessary to effectuate [its] relevant goals, it should tailor that requirement to ensure that it does not burden small gatherings posing no threat to the safety, order, and accessibility of [the forum]."   *Cox v. City of Charleston, SC*, 416 F.3d at 287.

### b.  Ample alternative channels of communication

A regulation fails to provide ample alternative channels of communication when it prevents speakers from reaching their target audiences.  *Weinberg v. City of Chi.*, 310 F.3d 1029, 1040-41 (7th Cir. 2002).   This is not one of the Access Policy's flaws.   Events smaller than 100 persons need no permit to proceed on the lawn just outside the Capitol, and in that way participants may reach out to all who enter and exit the building. Although winter and other inclement weather makes this a decidedly less attractive option for much of the year, this is not a case in which a speaker's "'ability to communicate effectively is threatened.'"  *Id.* at 1042 (quoting *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984)).

### B. Balancing of equities

Having found that plaintiff has a fairly strong likelihood of success on the merits of his claim, the court must balance the harm to plaintiff if there is no injunction, and the injury that an injunction would cause defendants and the State of Wisconsin.   On one hand, any First Amendment violation constitutes an irreparable harm to plaintiff, although given the many other opportunities that he has to voice his message just outside the Capitol, the court cannot say that the harm is likely to be great.   On the other hand, neither is there likely to be much harm to the State of Wisconsin if small gatherings are allowed in the Capitol rotunda without an advance permit.

Defendants point to the enormous protests that were witnessed at the Capitol in 2011 as a danger that will befall state property if they are wholly or partially enjoined from enforcing the Access Policy.   No doubt these fears drove the overly restrictive permitting process for small groups the court find likely infringes the First Amendment. On the record before it to date, the court finds these concerns are overblown at best, except for a permitting process applied to large groups.   In addition, as plaintiff points out, the permitting requirement as now written exempts spontaneous events, which are certainly the most challenging for law-enforcement purposes.   While another protest like the one in 2011 very well might again interfere with the functioning of ordinary business in the Capitol, an injunction restricting the permitting of small groups should have no practical effect on the policing required or the functioning of government in the Capitol's four wings.

### C. Severability

Two aspects of the Access Policy's current permitting scheme are unconstitutional: (1) the preference for cause-promoting speech in the Capitol is an unjustified, content-based restriction; and (2) the permitting requirement for "events" involving as few as one person is an unjustified time, place and manner restriction. The invalidity of these provisions raises the question of whether the rest of the Access Policy can be salvaged by severing or giving a limiting construction to the invalid parts.

Out of respect for both "separation of powers and federalism concerns," federal courts favor severing over re-writing state laws or regulations. *Eubanks v. Wilkinson*, 937 F.2d 1118, 1127 (6th Cir. 1991). Absent a severability clause, however, courts hesitate to sever if "[d]oing so would produce an unclear [regulatory] scheme that most likely would represent a greater problem than an unabridged version of the ordinance." *Schultz v. City of Cumberland*, 26 F. Supp. 2d 1128 (W.D. Wis.), *rev'd in part on severability grounds by Schultz v. City of Cumberland*, 228 F.3d 831 (7th Cir. 2000). "Severance is improper if the unconstitutional provisions in defendant's ordinance are an integral part of the ordinance." *Id.* (citing *Ragsdale v. Turnock*, 841 F.2d 1358, 1375 (7th Cir. 1988)).

Defendants' failure to arrive at an appropriate "numerical floor" for requiring smaller groups to obtain a permit could be grounds to enjoin enforcement of the entire Policy until the Department arrives at an appropriate number. *See Cox v. City of Charleston,* 416 F.2d at 286-87 (finding a permitting ordinance facially unconstitutional, but declining "to announce a numerical floor below which a permit requirement cannot apply"). This is not, however, a final judgment of facial unconstitutionality, and

45

defendants have established that some threshold is appropriate.  Accordingly, the court will enjoin defendants from requiring permitting for "events" in the Capitol rotunda of 20 persons or less.  This preliminary number attempts to protect the fundamental rights of plaintiff and others like him to freely assemble and engage in speech while permitting defendants the ability to manage the competing demands on the rotunda and quickly call on additional police officers if necessary.  Nothing in this order will prevent defendants from giving *preference* to those groups of whatever size that *do* obtain a permit in advance; or are exempt from that permitting process, should they determine in good faith that the competing uses of the rotunda on that day prevent all from proceeding simultaneously.

Without making any final determinations with respect to severance, the court preliminarily finds it appropriate to enjoin defendants from enforcing the content-based distinction found in § 3.J and the permitting requirement generally, as both apply to gatherings within the Capitol that are anticipated to attract 20 or fewer persons.

ORDER

IT IS ORDERED that:

1. plaintiff Michael Kissick's motion for a preliminary injunction (dkt. #2) is GRANTED; and

2. defendants are enjoined from enforcing the content-based distinction found in § 3.J and the permitting requirement generally, as applied to events in the Capitol that are anticipated to attract 20 or fewer persons.

Entered this 8th day of July, 2013.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge